```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
  UNITED STATES AND STATE OF NEW                            :
  YORK EX REL.                                              :   **MEMORANDUM**
  SHAHZADA QAZI,                                            :   **DECISION AND ORDER**
                                                            :
                          Relator,                          :   11 Civ. 1592 (BMC)
                                                            :
                  - against -                               :
                                                            :
BUSHWICK UNITED HOUSING                                     :
DEVELOPMENT FUND CORPORATION                                :
AND UNITED COMMUNITY OF                                     :
WILLIAMSBURG DAY CARE CENTER,                               :
INC.,                                                       :
                                                            :
                          Defendants.                       :
                                                            :
----------------------------------------------------------- X
```

**COGAN,** District Judge.

This action, brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and the New York False Claims Act ("NYFCA"), N.Y. State Fin. Law § 187 et seq., raises the issue of whether a public fund recipient's general certification of compliance with a permitting scheme results in a "false claim" if the recipient, notwithstanding its certification, fails to meet one of the requirements of the scheme and nevertheless signs the certification. I hold that since the certification here was not a prerequisite to payment, but merely the ability to obtain a permit, the complaint fails to state a claim.

## BACKGROUND

The following facts are taken from the Amended Complaint and are presumed true for purposes of this motion. Defendants Bushwick United Housing Development Fund Corporation ("Bushwick") and United Community of Williamsburg Day Care Center, Inc. ("UCW") provide

child care services to New York families, and receive reimbursement through federal and state funds.

A New York State regulation governs purchase of services by social services districts, including child care services, and states in relevant part: "All such purchases are subject to the following conditions: . . . Providers of services and foster care maintenance shall be licensed as required by law and shall comply with all applicable mandatory State and Federal standards." 18 N.Y.C.R.R. § 405.1(a)(5). A provider of child care services in New York City must apply biennially for a permit from the New York City Department of Health and Mental Hygiene (the "Department of Health"). The permit application includes a certification of compliance with the New York City Health Code. That certification states that the applicant has "read the New York City Health Code regulations pertaining to daycare and will comply with all regulations pertaining to daycare and will comply with all requirements if issued a permit."[1]

---

[1] The certification reads in full:

> I have read the New York City Health Code regulations pertaining to daycare and will comply with all regulations pertaining to daycare and will comply with all requirements if issued a permit.
> A. I am aware that an investigation will be made of the child care service site and operations to determine whether I comply with the requirements of the NYC HEALTH CODE. Failure to cooperate with this investigation may constitute a basis for denial of a permit.
> B. I am aware that a child care service permit is limited to the time period specified and must be renewed to continue operation.
> C. I am aware that if licensed I shall be subject to supervision or further inspection and that any complaints lodged against me must be investigated by the Department.
> D. I am aware that if licensed I must keep records and reports in full compliance with Department requirements.
> E. I am aware that to operate without a child care service permit in New York City constitutes a misdemeanor.
> F. I hereby certify that any statement made on this form or information given later on in the course of an investigation of my application will be true and correct to the best of my knowledge.
> If the permittee or his/her employees or agents refuse to answer questions related to this permit application after being granted testimonial or use immunity, this permit may be revoked or other appropriate action may be taken.

Because the Amended Complaint heavily relies upon this certification and incorporates it by reference, it is properly considered on a motion to dismiss. See, e.g., In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402 (S.D.N.Y. 2005).

Article 47 of the New York City Health Code addresses "Child Care Services." Section 47.23 establishes a ratio requirement for children to adults in day care settings, stating that one adult must be present at all times for every six children between the ages of two and three years-old; the total amount of children in a classroom cannot exceed twelve.

Relator Shahzada Qazi ("relator") worked as a teacher for UCW for ten years until June 2010. Relator alleges that her classroom had up to twenty-four children with only two adults supervising, and therefore UCW did not comply with the ratio requirements set forth by § 47.23 of Article 47. Relator claims that defendants falsely certified their compliance with Article 47 in order to receive a permit to conduct child care services, and that because that permit was necessary to be considered "licensed" under § 405.1(a)(5), UCW was ineligible to receive payment from the government.

Relator brought her concerns regarding her class size to UCW's upper management multiple times. She complained to Jose Gonzalez, the board chairman, and Brunilda Calderon, a director. According to relator, UCW did nothing to remedy the issue. Relator alleges that Mr. Gonzalez intended not to comply with Article 47 and to continue overpopulating the classrooms in order to maximize profits.

Despite relator's concerns, UCW, through Mr. Gonzalez, certified compliance twice with Article 47 on or about August 29, 2006 and July 11, 2008. UCW's 2006 application stated that United Community anticipated serving one hundred children, and the 2008 application stated ninety-five children. UCW's license was renewed each time. Relator alleges that Mr. Gonzalez knew that UCW served significantly more than those numbers of children because he monitored the classrooms every day. There is, however, no allegation in the Amended Complaint indicating that the Department of Health ever found any violations of the Health Code or

3

suspended defendant's permit to provide child care services.

On June 30, 2010, UCW stopped operating the day care facility at 152 Manhattan Avenue, Brooklyn, New York. One day later, Bushwick began day care operations at the same location. Relator alleges that all of UCW's equipment and property were transferred to Bushwick, and that Bushwick provided the same services to the same children once UCW ceased operations.

Relator filed her original complaint on April 1, 2011. In October 2012, both the United States and New York State governments declined to intervene. On January 24, 2013, relator filed an Amended Complaint, which defendants have now moved to dismiss. After defendants' motion to dismiss was filed, the United States and New York State governments (the "Interested Governments") requested, and received, permission to file a statement of interest.

## DISCUSSION

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. On a motion to dismiss under Rule 12(b)(6), the Court must assume the truth of "all well pleaded, nonconclusory factual allegations" in the complaint. Harrington v. Cnty. of Suffolk, 607 F.3d 31, 33 (2d Cir. 2010) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The Court must also draw "all reasonable inferences in the plaintiff's favor." Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). Nevertheless, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

To encourage private citizens to report fraud against the United States government, the FCA allows for *qui tam* lawsuits such as this one. See 31 U.S.C. § 3730(b). For a defendant to be liable under the FCA, the relator "must show that defendants (1) made a claim, (2) to the

United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001).

Defendants and relator apparently agree that claims were made to the United States government for reimbursement.[2] Thus, the only elements of the FCA at issue are whether the claim was false, and if defendants knew the claim was false. Broadly speaking, there are two types of false claims under the FCA: factually false claims and legally false claims. A factually false claim, envisioned by Congress as the "most common" type, "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Id. at 696.

Relator does not allege that UCW actually failed to provide the daycare services for which it claimed reimbursement. She instead proceeds under a theory of legal falsity.[3] A legally false claim is a claim for payment involving "a false representation of compliance with a federal statute or regulation or a prescribed contractual term." Id. The false certification of compliance

---

[2] The Court notes that the Amended Complaint does not cite any federal statutes or regulations under which federal payments were made to defendants, much less describe the terms and conditions placed on such payments by federal law. Instead, relator simply states in conclusory fashion that defendants received federal money in reimbursement for childcare services, and that "[d]efendants are not eligible to provide such services for reimbursement unless they are properly licensed as set forth in 18 N.Y.C.R.R. 405.1(a)(5)." This is, of course, a New York State regulation; the Amended Complaint leaves the Court entirely on its own to speculate as to whether this regulation applies to the distribution of federal funds. The Court assumes for the purposes of this motion that it does, because federal programs like Head Start are often administered through block grants of funding, subsequently distributed by state governments. See e.g., 42 U.S.C. § 9835(2)(A) (describing funding scheme under Head Start).

The Amended Complaint also does not allege that any claim for reimbursement was directly submitted to the federal government. The Court therefore also presumes, again without the benefit of briefing or allegation and solely for the purposes of this motion, that a claim submitted to a state government for reimbursement to be paid at least in part from federal funds may trigger FCA liability. There appears to be support for this proposition, at least in the Medicaid context. See United States v. Halifax Hosp. Med. Ctr., No. 09 cv 1002, 2012 WL 921147 at *4 (M.D. Fl. Mar. 19, 2012) (denying motion to dismiss because under the FCA "a defendant may be liable for submitting its own false claim or for causing another to submit a false claim," and defendants allegedly caused the state of Florida to submit false claims to the federal government).

[3] Relator appears to confuse the concepts of legal and factual falsity by arguing that the Amended Complaint alleges that defendants made "False Factual Certifications." According to the Amended Complaint, the falsity of any claim submitted by UCW depended entirely on UCW's alleged noncompliance with the law. This is the very definition of a legally false claim.

5

may either be express or implied. As the name suggests, an express false certification "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Id. at 698. An implied false certification, meanwhile, is premised on the notion that the very act of submitting a claim implies compliance with the governing rules that are a precondition to payment. Importantly, under either theory, a claim under the FCA is "legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment." Id. at 697.

Relator brings a claim for an express false certification. Defendants explicitly certified that they had read the "New York City Health Code regulations pertaining to daycare and will comply with all regulations pertaining to daycare and will comply with all requirements if issued a permit." Article 47 of the Health Code, although not specifically referenced in defendants' certification, addresses "Child Care Services" and contains the staffing requirements that relator claims were violated. See § 47.23. This provision is just one of the many requirements placed on child care services by Article 47, which range from requiring prospective employees to be screened for felonies, see § 47.19, to mandating that "[p]ets shall be kept in cages, and waste material within cages shall be cleaned daily or more often, if needed." § 47.53.

Defendants' certification, however, did not expressly condition payment on their compliance with the Health Code. Where "an express certification does not state that compliance is a prerequisite to payment," a court must "look to the underlying statutes to surmise if they make the certification a condition of payment." U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1218 (10th Cir. 2008). In doing so, courts are careful to distinguish between conditions of payment – requirements that would actually cause the government to refuse payment if it knew they were not being followed – and conditions of

6

program participation. Id. at 1220 (citing Mikes, 274 F.3d at 701-02). "Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program," and not liability under the FCA. Conner, 543 F.3d at 1220; see also U.S. ex rel. Colucci v. Beth Israel Med. Ctr., 785 F. Supp. 2d 303 (S.D.N.Y. 2011).

Here, defendants' certification of compliance with Article 47 was a condition of participation, not payment. First, there is no provision in Article 47 that conditions payment on compliance, or even references payment or reimbursement. The absence of any such provision, though not necessarily dispositive for an express false certification claim, is obviously an important factor in determining whether payment was indeed conditioned on certification. See Conner, 343 F.3d at 1219; cf. Mikes, 274 F.3d at 701-702 (discussing implied false certification claim); United States v. Dialysis Clinic, Inc., No. 5:09–CV–00710, 2011 WL 167246 (N.D.N.Y. Jan. 19, 2011) (same).

The overall structure of the underlying administrative scheme also supports this conclusion. Similar to the statute at issue in Mikes, Article 47 "acts prospectively," setting forth general obligations for providers of Child Care Services in New York City. Mikes, 274 F.3d at 701. These obligations are both broad and detailed, and are in essence "quality of care standards directed towards an entity's continued eligibility." Dialysis Clinic, 2011 WL 167246 at *19. Importantly, Article 47 does not require automatic denial or revocation of a permit upon non-compliance with any specific regulation. Instead, Article 47 provides that a permit shall not be renewed unless, after inspection, the Department finds the service "to be in substantial compliance with this Code and other applicable law." § 47.10. Similarly, the Commissioner

may suspend a permit and discontinue a child care service's operations where the Department of Health determines that an "imminent health hazard" or "risk of endangering the health or safety of children or other persons" exists. § 47.77. The fact that Article 47 provides for sanctions only in certain circumstances, and only after discretionary findings by administrative agencies, "makes it evident that [Article 47] is directed at [the defendants'] continued eligibility" for a permit to provide child care services "rather than any individual incident of noncompliance." Mikes, 274 F.3d at 702; see also Conner, 543 F.3d at 1221.

Further, permitting relator to base her FCA claim on this certification would undermine New York's administrative scheme. Read together, Article 47 and § 405.1(a)(5) clearly contemplate that local administrators would take responsibility for ensuring compliance with local Health Codes through, for example, the biennial inspections required before renewal of a permit. "[B]y permitting qui tam plaintiffs to file suit based on the violation of regulations which may be corrected through an administrative process and which are not related directly to the Government's payment of a claim, courts unwisely would shift the burden of enforcing" the New York City Health Code to themselves, even though administering those regulations is "best left to the administrators." U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 311 (3d Cir. 2011) (discussing federal administrative scheme for enforcing Medicare regulations).

Federalism concerns give this consideration, weighty enough in the Medicare context, even greater import here. By suggesting that defendants would not have been granted a permit had the Department of Health known of their staffing levels, relator is implicitly asking the federal courts to interpret municipal regulations. Although the Court could hazard a guess that, for example, employing convicted felons in violation of § 47.19 might cause denial or revocation of a permit, while failing to clean a gerbil cage daily in violation of § 47.53 might not, it is not

8

for the courts to usurp the discretionary administration of the Department of Health. Once the federal courts start addressing the issue of which violations are "serious enough" to give rise to a false claim and which are not, they will have effectively taken over the administrative function.

Relator, defendants, and the Interested Governments all devote extensive discussion to whether, under Mikes and its progeny, the FCA requires certification of legal compliance with a "particular" statute. Defendants contend that it does, and thus a certification may be too broad or general, as a matter of law, to support FCA liability. Relator and the Interested Governments strenuously oppose this notion, arguing that courts should instead consider only whether the certification was material to the government's decision to pay. The Court expressly declines to resolve this dispute. Regardless of whether the breadth of this certification or its materiality is considered, relator's FCA claim fails. For the reasons discussed above, the Court holds that the Amended Complaint fails to allege adequately that this certification was a condition of payment, rather than of participation.

Relator also argues that she need not allege more than "that Defendant made a false certification and would not have been paid but for the false certification." In other words, because UCW would not have received a permit had it not signed the form certifying its compliance with the Health Code, and because § 405.1(a)(5) limits payment to providers with a valid license, UCW's certification caused it to receive payment from the government.[4] This argument is far too simplistic. Obviously, failure to fill out a required form at any stage in the bureaucratic process would theoretically prevent a defendant from moving forward in that process, and therefore from receiving government funds. Were relator's view of the law correct, there would be no need for courts to analyze whether a certification had any influence

---

[4] Defendants dispute this interpretation of the regulations, and argue that the "license" required by § 405.1(a)(5) is not the same as the permit that required defendants to certify their compliance with the Health Code.

9

whatsoever on the government's decision to make payment; FCA liability would be automatic for any knowing violation of any regulation for which a defendant certified compliance, no matter how technical or attenuated from the government's actual payment decision. This result would be contrary to the Second Circuit's instruction that "not all instances of regulatory noncompliance will cause a claim to become false." Mikes, 274 F.3d at 697.[5]

In opposing defendants' motion to dismiss, relator appears to rely solely on an express false certification theory, correctly acknowledging that under an implied false certification theory, "payment to the contractor must be explicitly conditioned on compliance." See, e.g., Mikes, 274 F.3d at 700 ("implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid.") (emphasis in original). Nevertheless, to the extent relator also alleges an implied false certification theory, the Amended Complaint's allegations remain insufficient. As discussed, Article 47 does not mention payment or reimbursement at all. And although § 405.1(a)(5) does explicitly condition payment on a valid license, there is no allegation in the Amended Complaint that defendants ever violated that provision; it appears that defendants were duly licensed at all times when they sought reimbursement.

Relator has already had one opportunity to amend her complaint. Its problems are not subject to cure by additional or different allegations; they arise from the very nature of the certification and permitting process. Accordingly, additional leave to amend will not be granted.

---

[5] The Seventh Circuit's decision in United States ex rel. Main v. Oakland City University, 426 F.3d 914 (7th Cir. 2005), is not to the contrary. In that case, and unlike here, both a statute and a regulation explicitly conditioned "institutional eligibility" for payment of subsidies under the Higher Education Act "on a commitment to refrain from paying recruiters contingent fees for enrolling students." Id. at 916. The defendant university certified its eligibility (and thus its compliance with this prohibition) in one form, while students who were unwittingly enrolled in violation of these requirements submitted a second form requesting payment. The Seventh Circuit held that the defendant could be liable under the FCA despite this two-step process. This case thus stands for the rather uncontroversial proposition that a defendant's certification of compliance with laws and regulations that are explicit preconditions for payment eligibility may form the basis of FCA liability regardless of "how the federal bureaucracy has apportioned the statements among layers of paperwork." Id. at 917.

Finally, the NYFCA is "closely modeled on the federal FCA," and relator's claims under "the state statute are subject to dismissal for the same reasons" as her federal FCA claims. Dialysis Clinic, 2011 WL 167246 at *21.

## **CONCLUSION**

Defendants' motion to dismiss at [22] is granted. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       October 14, 2013